[No. 13791. *En Banc.* May 11, 1918.]

J. MATZGER, *Respondent,* v. ARCADE BUILDING & REALTY COMPANY, *Appellant.*[1]

ESTOPPEL—BY RECORD—JUDGMENT AND FAILURE TO APPEAL. Judgment unappealed from in a contempt proceeding to enforce an injunction, in which the court had jurisdiction to assess plaintiff's damages, dismissing the proceeding without prejudice to plaintiff's right to maintain an action for damages, estops the defendant from asserting that plaintiff elected his remedy in bringing an action for an injunction and so could not sue for damages.

LANDLORD AND TENANT — INTERRUPTION OF QUIET ENJOYMENT — MEASURE OF DAMAGES. The measure of damages for an interruption of quiet enjoyment by interference with light is the difference between the value of the property as furnished and the rent reserved, or the diminished value of the use of the property; loss of profits being usually regarded as too remote and speculative, unless proof of profits is so clear that they were, as a matter of law, within the contemplation of the parties.

SAME. The evidence of loss of property is not sufficient to bring a case within the exception to such rule, where the tenant's business was not interrupted, he complained only that facilities for carrying

[1]Reported in 173 Pac. 47.

it on were not so good as before, and there was nothing to show how much of the lost profits was due to the use of artificial lights, how much to plaintiff's partner being in a rival business, or how much to personal elements in the management of plaintiff's business and the sale of his goods.

Appeal from a judgment of the superior court for King county, Frater, J., entered November 5, 1915, upon the verdict of a jury rendered in favor of the plaintiff, in an action for damages. Reversed.

*Peters & Powell* and *Beebe & Whitcomb,* for appellant.

*Vanderveer & Cummings* and *Harry Sigmond,* for respondent.

CHADWICK, J.—This is an action to recover damages which the plaintiff, Matzger, claims to have suffered as the result of the acts of the defendant, Arcade Building & Realty Company, in the interference with the access of light and ventilation to the storeroom occupied by him as a tenant of that company. The plaintiff seeks to have the damages so suffered by him measured by the loss of profits and injury to goods in his business during the period of the defendant's alleged interference with the enjoyment of light and ventilation which he was entitled to as its tenant. The trial in the superior court sitting with a jury resulted in verdict and judgment against the defendant, awarding the plaintiff $7,000 damages, from which the defendant has appealed to this court.

For many years past, appellant has been the owner of the Arcade building and the Arcade Annex building, in Seattle. These buildings are upon the block bounded on the north by Union street, on the east by Second avenue, on the south by University street, and on the west by First avenue. The buildings occupy the whole of the block, excepting an alley thirty-five

feet wide, running north and south through the middle
of the block.   Appellant owns the whole of the block,
including the alley.   For* many years prior to the
month of February, 1913, respondent was engaged in
the ladies suit and cloak business in Seattle.   Early in
the year 1909, he became the tenant of appellant, oc-
cupying one of its storerooms in the Arcade building
fronting on Second avenue and extending back to the
alley between the two buildings.   This tenancy was
under a lease and continued until December 31, 1913,
when the lease expired.   It is alleged that, prior to the
acts of appellant now complained of, the rear of re-
spondent's storeroom was well adapted to facilitate
the fitting, altering and pressing of ladies suits and
cloaks.   This, because of the well-lighted condition of
the rear of the store, which condition resulted from the
fact that there was no building or other structure near
enough to the rear windows of the store to obstruct the
natural light.   The fitting, altering and pressing of
suits and cloaks was an important part of respond-
ent's business, as most suits require considerable at-
tention and work of this nature when sold to customers.
Respondent contends that to do this work requires
good natural light, otherwise mistakes would neces-
sarily occur, resulting in inferior service to customers
and consequent dissatisfaction on their part, and also
in damage to goods, rendering them less salable.

In February, 1913, appellant commenced the con-
struction of a covered bridge over a considerable por-
tion of the alley, with a view of connecting the upper
floors of the two buildings, which construction threat-
ened to seriously interfere with the access of light and
air to the rear of respondent's store.   Thereafter re-
spondent commenced an action in the superior court
for King county seeking to enjoin the construction of
the bridge because of its threatened interference with

the access of light and air to his store. That action resulted in a judgment against appellant, rendered April 23, 1913, enjoining it from erecting or placing within the alley any structure which would interfere with the free access of natural light and ventilation to respondent's storeroom as such natural light and ventilation had existed at and prior to the commencement of that action. That judgment was thereafter appealed from by appellant and affirmed by this court. *Matzger v. Arcade Building & Realty Co.*, 80 Wash. 401, 141 Pac. 900, L. R. A. 1915A 288. Thereafter appellant made some changes in its plans for the construction of the bridge over the alley, claiming such change would not interfere with respondent's light and ventilation as adjudicated in the injunction suit, and proceeded with the construction of the bridge in accordance with such changed plans. Thereafter respondent, conceiving that appellant was proceeding in violation of the injunction, commenced a contempt proceeding against it and its officers seeking to have them punished for violating the injunction and to coerce obedience thereto. On July 3, 1913, the contempt proceeding was dismissed. The order of the court is as follows:

"The above entitled matter coming on June 27, 1913, for hearing upon the application of the plaintiff to have the defendant adjudged in contempt for violating the decree heretofore entered in said cause; and said matter is submitted to the court upon the record, affidavits and argument of counsel, and by the court taken under advisement; and thereafter, to wit, on the first day of July, 1913, the court being advised in the premises;

"It is by the court ordered that said application be and the same is hereby denied, to which order said plaintiff excepts, the denial of said application being without prejudice to any claim or right for damages which said plaintiff may have against the defendant on

account of the putting up of the structure mentioned in said application.''

Respondent continued to occupy the storeroom under his tenancy until December 31, 1913, when his lease expired, and thereafter commenced this action to recover damages.

It is first contended by counsel for appellant that it is entitled to judgment in its favor as a matter of law, motions having been timely made in that behalf in the trial court, upon the ground that respondent having elected to seek relief by injunction, he should not now be permitted to seek damages in an action at law. Counsel argues that the commencement of the injunction action was an irrevocable election of a remedy on the part of the respondent. Rem. Code, § 1058 is invoked.

''The court or judicial officer, in addition to the punishment imposed for the contempt, may give judgment that the party aggrieved recover of the defendant a sum of money sufficient to indemnify him, and to satisfy his costs and disbursements, which judgment, and the acceptance of the amount thereof, is a bar to any action, suit, or proceeding by the aggrieved party for such loss or injury.''

*State ex rel. Nicomen Boom Co. v. North Shore Boom & Driving Co.,* 55 Wash. 1, 103 Pac. 426, 107 Pac. 196, is relied on. But whether we regard the statute as mandatory or otherwise, we think appellant is estopped by the record to raise this question. The court held in the contempt proceeding that its judgment of dismissal was without prejudice to the right of respondent to maintain an action for damages. This judgment was not appealed from, and the court, having jurisdiction to assess the damages, having entered a judgment without prejudice to another proceeding, appellant is estopped to raise the question in a collateral proceeding.

It is contended in appellant's behalf that loss of profits is not a proper measure of respondent's damages, and, therefore, the receiving of proof for that purpose was erroneous. The principal argument is that loss of profits could in no event be a lawful measure of damages resulting from interference with a leasehold interest in real property, but that the damages, if any were suffered, are to be measured by the lessening of the rental value of the premises.

It may be granted that, in certain cases, a tenant may show a loss of profits in the conduct of an established business where the landlord has unreasonably interfered with the full enjoyment and use of the demised premises. But cases so holding rest in an exception to a general rule, which has twice been declared by this court. *Kohne v. White,* 12 Wash. 199, 40 Pac. 794; *Purcell v. Warburton,* 70 Wash. 129, 126 Pac. 89. Interference with light is a breach of the covenant of quiet enjoyment. Taylor, Landlord and Tenant, 309 (a).

The measure of damages for an interruption of quiet enjoyment by the landlord is the difference between the value of the use of the property as furnished by the landlord and the rent reserved. In other words, it is the diminished value of the use of the property. Tiffany, Landlord and Tenant, § 79g; Underhill, Landlord and Tenant, § 432; Taylor, Landlord and Tenant, §§ 177 and 317; 16 R. C. L. 770.

Loss of profits are usually regarded as too contingent, remote or speculative to be considered. 16 R. C. L. 1056. The general rule should not be departed from unless it is impossible to measure the losses by it, or the character of the business is such and the proof of the profits so clear that the court can say, as a matter of law, that loss of profits was within the contemplation of the parties at the time the contract was made.

If this be so, it will declare lost profits to be the measure of damages.

In the case of *Purcell v. Warburton, supra,* it was contended that the landlord had not furnished heat as he had contracted to do, and because of his failure the tenant had been damaged. We referred to the case of *Kohne v. White, supra,* saying:

"The correct measure of damages is, therefore, the difference between the value of the use of the rooms as furnished by the plaintiff and heated as contemplated by the contract, and the value of their use as in fact heated by the defendants."

If the word "lighted" is substituted for the word "heated," we have an identical case.

But if it be held that the loss of usable value is not a proper measure of damages, the exception to the rule allowing a loss of profits should not be allowed in this case, for, in sound reason and under all authority, a loss of profits is not allowed unless they can be measured with a fair degree of accuracy. The testimony must be clear and free from taint of speculation or conjecture. The rule rests in a principle applied in all cases for damages arising out of a sale of property or the use of property.

To sustain a verdict for prospective profits, the jury must have some reasonable basis for estimating the worth of the business. From the nature of things, prospective profits cannot be proved to the dollar. Yet the law does demand that there shall be tangible evidence sufficiently clear and convincing to reasonably sustain a verdict. There must be some standard of comparison.

Respondent with another (his brother-in-law) had been in business for a term of years. Their books were not accurately kept. From time to time they had called in an expert accountant to measure the worth

of the firm.  He would force an inventory of the business based upon the amount of purchases and sales, and from this would make up a statement.

Respondent dissolved partnership with his partner in July.  No inventory was taken.  The goods were divided one-half to each.  In order to find the worth of the goods at the time of the dissolution for use in this suit, an accountant was employed.  He took the former forced inventories and, by a purely theoretical process of reasoning, came to the conclusion that the value of the goods left in respondent's hands was about $5,-793.41, so that it will be seen that the amount of goods with which respondent continued the business was not accurately determined.  The figures were arrived at by consulting so-called inventories, which in themselves were no more than a guess at value.

The books of the old business were continued as the books of respondent's business.  The books were admitted, but they constitute, with the exception of a few months, the record of an entirely different business, operating under different conditions with possibly a larger stock of goods, and showing in no way, as we have said, the value of the stock of respondent at the time he began to do business on his own account.

Moreover, we may assume that, with the dissolution of the firm and an equal division of the goods, the retiring partner going across the street and setting up business for himself, would in itself, in greater or less degree, diminish the profits which respondent might otherwise legitimately receive.  Then, again, the testimony shows that the retiring partner was what is called the "floor man" of the business.  He it was who met and had personal acquaintance with the customers of the firm, while respondent was office man and buyer.

With these things made clear in the record, we cannot understand how the court can find that percentages

based on the former business, and arrived at theoretically, are evidence from which a jury can draw a verdict with a reasonable degree of accuracy.

An examination of the cases will show that, where profits have been allowed as the measure of damages, there has generally been an interruption to the business amounting to an eviction. As, for example, the failure of a landlord to furnish steam heat in a hotel operated by his lessee, thereby making it uninhabitable for guests and doing away entirely with the tenant's business, or where the tenant was unlawfully evicted from the premises, or the landlord has maintained such a nuisance as to preclude the carrying on of the tenant's business.

In the instant case, the tenant was not evicted; his business was not interrupted; his sole complaint is that the facilities for carrying on his business were not so good after the alteration was made by the landlord. His whole case rests on the damages which he claims resulted to him because some of his light and fresh air was shut off and he was compelled to use artificial light in place of natural light. He testifies that nearly all garments have to be altered, and that his workmen made mistakes working under the artificial light, so that customers would return the goods and a sale would be lost. How many garments were thus spoiled, and whether it was due to the light or to the inefficiency or carelessness of the workmen, is of course entirely problematical. As between employer and employee, respondent could say it was the workman's fault; and as between himself and the landlord, he could, with the same show of reason, blame it on the loss of light.

The same is probably true as regards his contention that sales were lost because the customer could not see the true color of the goods under the artificial light. There is no showing that the customer was prevented

from going to the front of the store and seeing the goods by daylight. As between himself and the salesman, if a sale were lost, the respondent could blame the salesman; and as against the "greedy landlord," as he calls the defendant, he could put the blame on the artificial lights.

Admitting, as respondent claims, that his business was damaged by the acts of the defendant, yet there is nothing in the record that would warrant a jury in determining how much of the lost profits was due to the use of artificial lights, how much to plaintiff's partner being in a rival business, and how much may have been due to personal elements in the management of plaintiff's business and the sale of his goods.

It is for the reasons appearing from every angle of this case that the law asserts the general rule that, for a breach of the covenants of a lease, the measure of damages is the difference between the value of the term and the rent reserved.

There is further evidence that the books did not evidence the true condition of the firm or of respondent's business. He admits that he had deposited something like $53,000 of his own money in the bank with the intent and for the purpose of creating a false standard of credit. His purpose being to so establish himself that he might have less difficulty in obtaining sufficient credit to eventually engage in the wholesale trade.

Reversed and remanded for a new trial.

ELLIS, C. J., HOLCOMB, MOUNT, FULLERTON, MAIN, WEBSTER, and PARKER, JJ., concur.